UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

─────────────────────────────────────────

WINSTON E. HYMAN,

        Plaintiff,

   v.

COUNTY OF ALBANY, ALBANY COUNTY
SHERIFF'S OFFICE, CRAIG APPLE,
Sheriff, in his individual and official capacities,
FORMER SUPERINTENDENT THOMAS WIGGER,
in his individual and official capacities,  CHIEF BRIAN
MOONEY, in his individual and official
capacities, CHRISTOPHER B. ABRAMS,
in his individual and official capacities, JARROD M.
JOURDIN, in his individual and official capacities,
LANNY JENSEN, in his individual and official
capacities, JOSHUA W. COLLINS, in his individual
and official capacities, SERGEANT TIMOTHY
FRANCIS, in his individual and official capacities,
OFFICER JULIE HALL, in her individual and official
capacities, OFFICER MATTHEW COREY, in his
individual and official capacities, OFFICER TIMOTHY
KEHN, in his individual and official capacities,
OFFICER DENNIS GALKIEWICZ, in his individual
and official capacities,  OFFICER JAMES SHEEDY,
in his individual and official capacities, SERGEANT
JOHN CRUDO, in his individual and official capacities,
LIEUTENANT WILLIAM FITCH, in his individual and
official capacities, NURSE CHRISTINE MORIARTY,
NURSE PATRICIA FRASER, NURSE RICHARD
KOWALSKI, NURSE MARA RIVERA, NURSE LORI
HORN, NURSE CARLY LAGACE, AZAZ
HAIDER-SHAH, M.D., facility physician,
CORRECTIONAL MEDICAL CARE, INC., individually
and as an agent/employee of the County of Albany,

        Defendants.

─────────────────────────────────────────

**FIRST AMENDED
COMPLAINT**

**JURY TRIAL DEMANDED**

  Civil Action No.:
  9:13-cv-770 (NAM/ATB)

The Plaintiff, Winston Hyman, by and through his attorney, Jessica M. Gorman, complains and

alleges of the Defendants as follows:

## INTRODUCTION

1.  This action seeks redress for the deprivation by Defendants, acting under color of law, of rights guaranteed to the Plaintiff under the United States Constitution and federal law. The Defendants deprived the Plaintiff of these guaranteed rights by brutally assaulting him, failing to provide appropriate medical care, and retaliating against him for filing grievances related to his treatment.

## JURISDICTION

2.  This action is brought pursuant to 42 U.S.C. § 1983.  This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 2201 because it is brought to seek relief and/or damages for the deprivation, under color of state law, of the rights guaranteed by the Constitution of the United States and federal law.

3.  Venue is proper in this District pursuant to 28 U.S.C. § 1391 because the events giving rise to the claims herein occurred in this judicial district.

## PARTIES

4.  Plaintiff WINSTON E. HYMAN is a citizen of the United States and currently resides in Oneida County, New York.

5.  Defendant COUNTY OF ALBANY is a municipal corporation duly incorporated under the laws of the State of New York, and was at all times relevant hereto the employer and/or principal of the Defendants .

6.  Defendant ALBANY COUNTY SHERIFF'S OFFICE is a division of the County of Albany.  The Office is responsible for the operation of the Albany County Correctional Facility.

7. At all times relevant herein, Defendant CRAIG APPLE ("Sheriff Apple") was and remains employed as the Albany County Sheriff, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207. Defendant Apple was and remains in charge of the operations of the Albany County Sheriff's Office and of the Albany County Correctional Facility. Defendant Sheriff Apple is responsible for establishing, instituting, and enforcing the policies, procedures, and practices of the Albany County Sheriff's Office and the Albany County Correctional Facility. Defendant Sheriff Apple is also responsible for supervising corrections officers and deputies of the Albany County Sheriff's Office. Claims against Defendant Sheriff Apple are asserted in his individual and official capacities.

8. Defendant THOMAS WIGGER ("Former Superintendent Wigger") is the former Superintendent of the Albany County Correctional Facility and was the Superintendent at the time of the events herein. Defendant Wigger was responsible for the day-to-day operations of the Albany County Correctional Facility and for the direct supervision of employees, including corrections officers, at the Facility. The principal place of business of Defendant Wigger was the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Former Superintendent Wigger are asserted in his individual and official capacities.

9. At all times relevant herein, Defendant CHIEF BRIAN MOONEY ("Chief Mooney") was and remains employed as an Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Mooney are asserted in his individual and official capacities.

10. Upon information and belief, and at all times relevant herein, Defendant DEPUTY CHRISTOPHER B. ABRAMS ("Deputy Abrams") was and remains employed as an Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207.  Claims against Defendant Abrams are asserted in his individual and official capacities.

11. Upon information and belief, and at all times relevant herein, Defendant DEPUTY JARROD M. JOURDIN ("Deputy Jourdin") was employed as an Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207. Claims against Defendant Jourdin are asserted in his individual and official capacities.

12. Upon information and belief, and at all times relevant herein, Defendant DEPUTY LANNY JENSEN ("Deputy Jensen") was and remains employed as an Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207.  Claims against Defendant Jensen are asserted in his individual and official capacities.

13. Upon information and belief, and at all times relevant herein, Defendant DEPUTY JOSHUA W. COLLINS ("Deputy Collins") was and remains employed as an Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Sheriff's Office, 6 Lodge Street, Albany, New York 12207.  Claims against Defendant Collins are asserted in his individual and official capacities.

14. Upon information and belief, and at all times relevant herein, Defendant SERGEANT TIMOTHY FRANCIS ("Sergeant Francis") was and remains employed as an Albany

County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.  Claims against Defendant Francis are asserted in his individual and official capacities.

15. Upon information and belief, and at all times relevant herein, Defendant OFFICER JULIE HALL ("Officer Hall") was and remains employed as Albany County Sheriff's deputy or corrections officer, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Officer Hall are asserted in her individual and official capacities.

16. Upon information and belief, and at all times relevant herein, Defendant MATTHEW COREY ("Officer Corey") was and remains employed as Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Officer Corey are asserted in his individual and official capacities.

17. Upon information and belief, and at all times relevant herein, Defendant TIMOTHY KEHN ("Officer Kehn") was and remains employed as Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.  Claims against Defendant Officer Kehn are asserted in his individual and official capacities.

18. Upon information and belief, and at all times relevant herein, Defendant DENNIS GALKIEWICZ ("Officer Galkiewicz") was and remains employed as Albany County

5

Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Officer Galkiewicz are asserted in his individual and official capacities.

19. Upon information and belief, and at all times relevant herein, Defendant OFFICER JAMES SHEEDY ("Officer Sheedy") was and remains employed as Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Officer Sheedy are asserted in his individual and official capacities.

20. Upon information and belief, and at all times relevant herein, Defendant SERGEANT JOHN CRUDO ("Sergeant Crudo") was and remains employed as Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against these Defendant Sergeant Crudo are asserted in his individual and official capacities.

21. Upon information and belief, and at all times relevant herein, Defendant LIEUTENANT WILLIAM FITCH ("Lieutenant Fitch") was and remains employed as Albany County Sheriff's deputy or corrections officer, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Claims against Defendant Lieutenant Fitch are asserted in his individual and official capacities.

22. Upon information and belief, and at all times relevant herein, Defendant NURSE CHRISTINE MORIARTY ("Nurse Moriarty") was and remains employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.  Upon information and belief, Defendant Nurse Moriarty is a Licensed Practical Nurse.

23. Upon information and belief, and at all times relevant herein, Defendant NURSE PATRICIA FRASER ("Nurse Fraser") was and remains employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Upon information and belief, Defendant Nurse Fraser is a Registered Nurse.

24. Upon information and belief, and at all times relevant herein, Defendant NURSE RICHARD KOWALSKI ("Nurse Kowalski") was employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Upon information and belief, Defendant Nurse Kowalski is a Registered Nurse.

25. Upon information and belief, and at all times relevant herein, Defendant NURSE MARA RIVERA ("Nurse Rivera") was and remains employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.  Upon information and belief, Defendant Nurse Rivera is a Licensed Practical Nurse.

26. Upon information and belief, and at all times relevant herein, Defendant NURSE LORI HORN ("Nurse Horn") was and remains employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.  Upon information and belief, Defendant Nurse Horn is a Licensed Practical Nurse.

27. Upon information and belief, and at all times relevant herein, Defendant NURSE CARLY LAGACE ("Nurse Lagace") was and remains employed as a facility nurse at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates at the Albany County Correctional Facility, with her principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211. Upon information and belief, Defendant Nurse Lagace is a Licensed Practical Nurse.

28. Upon information and belief, and at all times relevant herein, Defendant S. AZAZ HAIDER-SHAH, M.D. ("Dr. Haider-Shah") was and remains employed as the facility

physician at the Albany County Correctional Facility, through the County of Albany's contract with Correctional Medical Care, Inc., providing medical services to the inmates of the Albany County Correctional Facility, with his principal place of business being the Albany County Correctional Facility, 840 Albany-Shaker Road, Albany, New York 12211.

29. At all times relevant herein, Defendant CORRECTIONAL MEDICAL CARE, INC. ("Correctional Medical Care") was and remains the official provider of medical services for the Albany County Correctional Facility, with its corporate offices at 920 Harvest Drive, Suite 120, Blue Bell, Pennsylvania 19422.  Defendant Correctional Medical Care provides these medical services pursuant to a contract with the County of Albany.

30. At all times relevant herein, the individual Defendants acted in the scope of their authority as public servants for the Albany County Sheriff's Office and the County of Albany.

31. At all times relevant herein, the individual Defendants acted under color of law, to wit, under the color of the Constitution, statutes, laws, rules, regulations, ordinances, charters, customs, policies, and usages of the State of New York and the County of Albany.

**FACTS**

32. On August 16, 2012, while incarcerated as a pre-trial detainee at the Albany County Correctional Facility (ACCF) in Albany, New York, Plaintiff Winston E. Hyman was twice brutally assaulted by Defendant deputies and corrections officers.

33. The first assault occurred on the morning of August 16, 2012.  Immediately prior to the assault, the Plaintiff was being held in the bullpen area of the ACCF waiting to be transported to a court appearance scheduled for that day.

34. Upon information and belief, on the morning of the assault, the bullpen was more full than usual with inmates.

35. Prior to transport, inmates are required to undergo a strip search.  Defendant Deputy Christopher Abrams directed the Plaintiff to go into the bullpen to be strip-searched.  The Plaintiff fully complied.

36. After he was strip-searched, the Plaintiff began to get dressed.  Defendant Abrams then directed the Plaintiff to exit the bullpen to be handcuffed.  The Plaintiff complied and was handcuffed, even though he was not yet fully dressed.

37. The Plaintiff asked Defendant Abrams if he could finish buttoning his clothing prior to moving to the next location.

38. Defendant Abrams yelled that he did not have time for "bullshit" that morning, and yelled at the Plaintiff to "hurry up."

39. The Plaintiff complied, while still trying to button his clothing, when suddenly, and without warning, Defendant Abrams grabbed the Plaintiff's shoulder and shoved him.

40. As the Plaintiff pulled away, he told the Defendant that he did not need to shove him.

41. This apparently infuriated Defendant Abrams, who then attacked the handcuffed Plaintiff by punching him in his right eye.

42. Several other Defendants, including Deputies Abrams, Jarrod Jourdin, Lanny Jensen, and Joshua Collins, and Corrections Officers Matthew Corey, and Timothy Kehn, then rushed

and tackled the Plaintiff, and threw him down, causing his head to slam on the concrete floor.

43. Several other Defendants, including Corrections Officers Julie Hall, Dennis Galkiewicz, James Sheedy, Sergeant John Crudo, and Lieutenant William Fitch arrived thereafter.

44. Upon information and belief, Defendants Abrams, Jourdin, Jensen, Collins, Corey, Kehn, and Galkiewicz directly participated in the assault.

45. At some point, an unknown Defendant kneeled on the Plaintiff's throat, which cut off his air supply.

46. The Plaintiff was unable to breathe and began choking and gurgling.  He attempted to tell the Defendants he was being choked.  The Plaintiff also remembers hearing several inmates yelling to Defendants, "You're choking him!"

47. Although the Plaintiff was handcuffed, restrained by the Defendants, unable to breathe, and not resisting, another Defendant, believed to be Defendant Jensen, proceeded to punch the Plaintiff in the face at least six or seven times, while another Defendant punched him in the ribs.

48. The Plaintiff then lost consciousness.

49. Upon information and belief, the Defendants continued to beat the Plaintiff even after he passed out from being choked.

50. Moreover, upon information and belief, at least four other Defendants, including Defendants Hall, Sheedy, Crudo, and Fitch directly observed the assault.  Yet not a single one of these Defendants took any action whatsoever to stop it.  Instead, these Defendants stood by and watched as the Plaintiff was ruthlessly beaten by their fellow officers and deputies.

51. Eventually, several Defendants lifted the still unconscious Plaintiff off of the ground and carried him away.

52. When the Plaintiff regained consciousness, he was in another part of the booking area. He was still handcuffed and was shackled.

53. Lieutenant Wayne Bashford was standing over him, and several others were also there or arrived shortly thereafter, including, upon information and belief, Captain Harris, and Defendants Crudo, Nurse Moriarty and Chief Mooney.

54. When Defendant Crudo asked the Plaintiff if he was alright, Captain Harris said "Don't worry, we're going to get him for assault on an officer."

55. Defendant Nurse Moriarty asked the Plaintiff what happened.  An unknown officer told her not to worry about it.  The Plaintiff told Defendant Nurse Moriarty that, among other injuries, he had lost consciousness.

56. Nurse Moriarty checked the Plaintiff's blood pressure and told him that it was very high.

57. She also remarked that the Plaintiff suffered a severe gash in his mouth, and she cleaned some of the blood in and around his mouth.

58. During her blood pressure check and cleaning of Plaintiff's mouth, the Plaintiff repeatedly slumped down, as he was dizzy and unable to remain fully upright.  Officers had to continuously prop the Plaintiff back up so that he could be seen by the nurse and have photographs taken.

59. Photographs taken immediately after the assault show the Plaintiff's clothing still unbuttoned from the waist up, and show some of the visible injuries on the Plaintiff's face, including hemorrhaging in his right eye, bruising on his nose, swelling on his nose,

swelling on both his eyes, swelling on his face, swelling on his lips, and an apparent cut in his mouth area.

60. Based on the Plaintiff's condition and his complaints, Defendant Nurse Moriarty was, or should have been, aware that the Plaintiff had suffered serious injuries. Despite this, however, upon information and belief, Defendant Nurse Moriarty did not visibly examine the Plaintiff's body for injuries, fractures, or bleeding, listen to his lungs, or otherwise perform more than a cursory "once-over" examination of the Plaintiff. Nor did she provide or arrange for any other medical evaluation, observation, or treatment for the Plaintiff, despite the fact that he had received blows to his face, head, and body, lost consciousness, and was unable to remain sitting fully upright on his own.

61. Defendant Nurse Moriarty then told the Plaintiff that he would be brought to the facility medical department for treatment of the severe gash in his mouth.

62. The Plaintiff was not, however, brought to medical. Instead he was processed for transport to the Albany County Court for his court appearance.

63. Prior to being further processed for transport to court, the Plaintiff, who had defecated on himself at some point during the assault, asked if he could change his clothing.

64. Defendant Jourdin denied his request and forced the Plaintiff to suffer the further indignity of sitting in excrement-covered clothing.

65. Defendant Jourdin's refusal to allow the Plaintiff to change clothing served absolutely no purpose other than to humiliate and punish the Plaintiff.

66. At some point thereafter, the Plaintiff was loaded onto the transport van.

67. Upon information and belief, the Plaintiff was then transported to court by Deputy Maurice McCormick and Defendant Deputy Collins.

68. When the transport van arrived at the Court, the Plaintiff, who was handcuffed and shackled, stood at the van door to step out.

69. One of the transport deputies, believed to be Defendant Deputy Collins, then assaulted the Plaintiff by yanking him by his clothing and heaving him out of the van.

70. This caused the Plaintiff to fall head first and hit his head on the concrete several feet below, further injuring him.

71. This was at least the ninth time in the span of a few hours that the Plaintiff suffered trauma to his face and head.

72. As Defendant Collins yanked the Plaintiff out of the van, he told the Plaintiff that if he wants to "fuck with my officers" he was "going to have a long fucking day."

73. Defendant Collin's actions had no legitimate purpose other than to intimidate and punish the Plaintiff.

74. While the Plaintiff was in the holding area of the Court, Defendant Collins and two other deputies in the court that day continued to verbally harass the Plaintiff, calling him an "idiot' and a "fucking asshole."

75. At some point, a court deputy brought lunch to the other inmates who were also waiting in the holding area.

76. This deputy, refused, however, to give the Plaintiff any food, telling him if he wanted food to "fucking grieve it."

77. Due to his condition, the Plaintiff's court appearance had to be adjourned.

78. Upon information and belief, the Plaintiff was then transported from the court back to the ACCF by Deputy Ryan Cross and Defendant Deputy Jourdin.

79. During his transport back to the ACCF, Defendant Jourdin told the Plaintiff that "this" (which presumably meant further harassment and retaliation), is what happens when an inmate assaults an officer, and that the Plaintiff was "lucky" he didn't assault that Defendant.

80. When the Plaintiff returned to the ACCF, he was asked by several corrections officers what had happened, as they had apparently viewed a jail video tape of the incident.

81. Lieutenant Cook and another corrections officer then told the Plaintiff he was going to the "box" for assaulting an officer.

82. The Plaintiff, who was still in his excrement-covered clothing, was then brought to the Special Housing Unit (SHU) to be locked in solitary confinement, where he was prohibited from making any telephone calls for several days, prohibited from using commissary, and had his personal property taken from him, including his envelopes which prevented him from being able to write to anyone.

83. At some point after he was put in the SHU, Defendant Nurse Fraser arrived.  The Plaintiff complained to her of severe head pain and vision difficulties.  He also complained to her of ongoing severe pain in his ribs, and of the severe gash in his mouth, which continued to bleed, among other injuries.

84. Defendant Nurse Fraser acknowledged the Plaintiff's injuries but told him that the facility physician, Defendant Dr. Haider-Shah, was not in so he would have to wait until the next day to be examined by the physician.

85. Upon information and belief, Defendant Nurse Fraser was, or should have been, aware that the Plaintiff suffered serious injuries, including numerous blows to his face, head and

body several hours prior, yet she did not provide or arrange for any medical evaluation, observation, or treatment for the Plaintiff.

86. The next day, Defendant Dr. Haider-Shah failed to examine the Plaintiff.

87. After the physician failed to see him, the Plaintiff submitted a sick slip complaining of pain in his body and in his head, stating that he was unable to sleep, and requesting that he be seen by a doctor.

88. On August 18, 2012, the Plaintiff was taken to sick call.

89. The Plaintiff's eyes were black and blue and swollen and he complained of severe pain. Medical staff told him that he would heal because he did not have any broken bones.

90. No x-rays or other imaging tests were done for the medical staff to actually know whether the Plaintiff did or did not have broken bones.

91. After this medical "evaluation," the Plaintiff continued to suffer in severe pain but was told that the facility had run out of sick slips so he could not submit a grievance.

92. As a result, the Plaintiff handwrote multiple sick slips in an effort to receive adequate medical attention and to be seen by the facility physician.

93. The Plaintiff also repeatedly, over the course of several weeks, verbally requested to be seen by the facility physician and complained to round and medication administration nurses, including Defendant Nurses Fraser, Kowalski, Mara Rivera, Lori Horn, and Carly Lagace, and to corrections officers of painful ribs, back, and neck, painful breathing, severe headaches, and several other complaints arising from his injuries.

94. The Plaintiff, who still had visible injuries, including black eyes and open gashes, continued to bleed intermittently from the severe gash in his mouth which had not been treated or stitched.

16

95. In fact, the only medical "treatment" the Plaintiff received during this time was Motrin, even though the Plaintiff's medical record clearly noted that the Plaintiff was allergic to Motrin.

96. The Motrin was ordered by Defendant Dr. Haider-Shah without examining the Plaintiff and the order was written by Defendant Nurse Fraser.  Upon information and belief, the Motrin was dispensed to the Plaintiff by Defendant Nurses Moriarty, Rivera, Horn, and Lagace.

97. After ten days of dispensing Motrin to the Plaintiff, medical staff switched the Plaintiff to another medication.

98. Upon information and belief, Defendant Dr. Haider-Shah did not examine the Plaintiff prior to prescribing this other medication, nor was the Plaintiff evaluated for reactions or medical problems from the Motrin.

99. The Plaintiff was not given any medication on August 24, 25, or 26, although he was still suffering in severe pain and had visible injuries.

100. Upon information and belief, Defendant Nurse Fraser also repeatedly told the Plaintiff during this time that she did not know why he had not yet been seen by the facility doctor.

101. Finally, the Plaintiff was provided with sick slips.

102. On August 27, August 29, and September 3, 2012, the Plaintiff submitted additional sick slips complaining of ongoing body pain, head pain, and headaches, and requesting, yet again, to be seen by the facility physician.

103. On September 4, 2012, nearly three weeks after he was injured in two brutal assaults, Defendant Dr. Haider-Shah finally examined the Plaintiff.

17

104. Defendant Dr. Haider-Shah prescribed two prescription pain medications to the Plaintiff and ordered an x-ray of his hip and cervical spine because the Plaintiff was still suffering from pain in his body and head and he was unable to fully turn his head.  No other imaging tests were ordered, including images of the Plaintiff's ribs, face, head, or other areas of his body which had been injured in the assaults and of which the Plaintiff complained of ongoing and severe pain.

105. Although he had been assaulted, the Plaintiff was charged with four disciplinary violations:  one count of causing a disturbance, one count of refusing an order, one count of interference, and one count of assault.

106. Upon information and belief, however, the Plaintiff was charged with these violations in an attempt to cover up the fact that he was viciously and unjustifiably assaulted by the Defendant deputies and corrections officers.

107. Further supporting the fact that these disciplinary violations were an attempt to cover up these Defendants' actions is the fact that Defendant Abrams lied in his written statements about the bullpen incident.

108. For example, in one Sheriff's office record, Defendant Abrams' wrote that he struck the Plaintiff with his elbow.

109. In another Sheriff's office record written on a different date, Defendant Abrams not only repeats the fabrication about using an "elbow strike" but also fails to indicate that he used a hand strike on the Plaintiff.

110. In addition, even though the Plaintiff had in fact passed out during the bullpen assault, Defendant Abrams stated in this record that the Plaintiff was "agitated and beligerent [sic]"  immediately following the final control technique used on him.  Defendant

18

Abrams also failed to check a box on the written report to indicate that the Plaintiff had lost consciousness.

111. The enormous disparities between jail video of the first assault and the written reports about it substantiate the unjustified nature of the assault.

112. Upon information and belief, immediately or soon after this assault, these records and video were submitted to the Defendant Albany County Sheriff's Office which opened an investigation into the incident.

113. At some point during his confinement in SHU, believed to be on or about August 18, 2012, the Plaintiff filed a grievance for one or both of the assaults.

114. Upon information and belief, Defendant Sergeant Francis initially handled the grievance.

115. A Defendant, also believed to be Defendant Francis, told the Plaintiff that if he had not "made a big stink," the "whole thing" would have gone away.

116. Defendant Francis also told the Plaintiff that the disciplinary charges could still "go away" if the Plaintiff withdrew his grievance against the officers.

117. The Plaintiff refused to withdraw the grievance so Defendant Francis told the Plaintiff he would "get back to him" in a few days with a response to the grievance.

118. When the Plaintiff did not receive a response, he inquired as to the status of his grievance. Defendant Francis stated that he had no idea what the Plaintiff was talking about and the Plaintiff was refused a copy of his grievance.

119. On August 23, 2012, the Plaintiff's disciplinary hearing was held. Lieutenant Cook, the hearing officer, viewed video of the bullpen assault, photographs of the Plaintiff taken shortly after, and according to jail records, he also reviewed an officer's report of the

incident.  Upon information and belief, the officer's report was one or both of Defendant Abrams' reports.

120. The Plaintiff was found guilty of refusing an order and guilty of interference, and he was found not guilty of creating a disturbance and not guilty of assault, and was sentenced to 100 days in solitary confinement.

121. As of August 27, 2012, the Plaintiff had still not received a reply to his grievance, so he wrote to the Commission of Correction.

122. On September 5, 2012, the Commission of Correction responded to the Plaintiff stating that they were inquiring into his complaint and would advise him of their findings when their inquiry was complete.

123. To date, the Commission of Correction has not notified the Plaintiff of its findings.

124. The Plaintiff also wrote a grievance to Defendant Chief Mooney regarding his SHU sentence and requesting that it be cut.  This request was denied.

125. At some point near the end of October, after spending approximately two and a half months in solitary confinement, the Plaintiff, who had lost approximately 17 pounds, was removed from SHU and put into long-term keep-lock.

126. On or about the same day the Plaintiff was put into keep-lock, a Defendant who was, upon information and belief, Chief Mooney told the Plaintiff that he would have let him out of solitary several weeks prior if he had not contacted the Commission of Correction.

127. Both the Commission of Correction and the Albany County Sheriff's Office did, or should have, conducted investigations into the assaults on the Plaintiff.

128. Upon information and belief, however, no disciplinary action was taken against any of the Defendants for the assaults, attempted cover-ups, or retaliation against the Plaintiff.

129. The Plaintiff was sentenced on his underlying conviction on December 19, 2012, and transferred to Downstate Correctional Facility on December 28, 2012.

130. While at Downstate, the Plaintiff was evaluated by medical staff who determined that he was still injured.

131. The Plaintiff received medical treatment for his injuries, including x-rays of his injuries, and prescription pain medications.

132. To date, the Plaintiff continues to suffer from his injuries, has ongoing pain, and continues to receive medical treatment for these injuries.

## CAUSES OF ACTION

### AS AND FOR A FIRST CAUSE OF ACTION AGAINST DEFENDANTS ABRAMS, JOURDIN, JENSEN, COLLINS, COREY, KEHN, AND GALKIEWICZ

**Violation of Constitutional Rights Under Color of State Law**
**Excessive Use of Force**

133. The Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 132.

134. The aforementioned assaults against the Plaintiff by the above-named Defendants were undertaken intentionally, willfully, maliciously, sadistically, and for the purpose of harming and punishing the Plaintiff.

135. Even though the Plaintiff was handcuffed, restrained, and not resisting, Defendants Abrams, Jourdin, Jensen, Collins, Corey, Kehn, and Galkiewicz nonetheless beat him wantonly and mercilessly in the bullpen.  Upon information and belief, this assault continued even after the Plaintiff lost consciousness.  To further degrade the Plaintiff, Defendant Jourdin refused to allow him to change out of his clothing.

21

136. Defendant Collins also gratuitously assaulted the Plaintiff, in an apparent effort to intimidate and retaliate against him, while the Plaintiff was handcuffed and shackled.

137. These actions by the above-named Defendants, taken under color of state law, violated the Plaintiff's right to be free from excessive force and cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments of the Constitution of the United States, and are also a violation of 42 U.S.C. § 1983.

138. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.


**AS AND FOR A SECOND CAUSE OF ACTION AGAINST DEFENDANTS HALL, SHEEDY, CRUDO, FITCH, FRANCIS, AND MOONEY**

**Violation of Constitutional Rights Under Color of State Law
Failure to Intervene/Failure to Protect**

139. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 138.

140. Corrections officials have a duty to take reasonable steps to protect inmates in their care and custody and to intervene when the Constitutional rights of such inmates are violated.

141. Defendant Officers Hall and Sheedy, and Defendants Sergeant Crudo and Lieutenant Fitch violated this duty when they stood by and watched in the bullpen as the Plaintiff was choked, punched, and beaten into unconsciousness by their co-Defendants.

142. Upon information and belief, not a single one of these Defendants made even a minimal effort to intervene or to otherwise protect the Plaintiff.

143. Defendants Sergeant Francis and Chief Mooney also violated their duties to intervene and to protect the Plaintiff from further violations of his Constitutional rights.  These

Defendants were aware that the Plaintiff had been assaulted by corrections officers and deputies, however, upon information and belief, neither of them took any action to remedy the violations or to ensure they did not continue against the Plaintiff.

144. Moreover, instead of intervening to protect the Plaintiff from further violations of his rights, these Defendants perpetuated the violations by allowing and participating in the cover-up of one or both of the assaults against the Plaintiff and in his retaliatory confinement.

145. The deliberate failures of the above-named Defendants, taken under color of state law, to protect the Plaintiff from existing and ongoing violations of his rights, allowed the Plaintiff to be seriously injured and violated his right to be free from excessive force and cruel and unusual punishment, as guaranteed by the Eighth and Fourteenth Amendments of the Constitution of the United States, and are also a violation of 42 U.S.C. § 1983.

146. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

**AS AND FOR A THIRD CAUSE OF ACTION AGAINST DEFENDANTS DOCTOR HAIDER-SHAH, NURSE MORIARTY, NURSE FRASER, NURSE KOWALSKI, NURSE RIVERA, NURSE HORN, NURSE LAGACE, CORRECTIONAL MEDICAL CARE, INC., ALBANY COUNTY SHERIFF'S OFFICE, AND ALBANY COUNTY**

**Violation of Constitutional Rights Under Color of State Law
Failure to Provide Medical Treatment/Deliberate Indifference to Serious Medical Needs**

147. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 146.

148. The Eight and Fourteenth Amendments of the Constitution of the United States prohibit jail officials from deliberately denying medical treatment to an inmate with serious medical needs.

149. The Plaintiff had clear and serious medical needs which were deliberately ignored by Defendants Dr. Haider-Shah, Nurse Moriarty, Nurse Fraser, Nurse Kowalski, Nurse Rivera, Nurse Horn, Nurse Lagace, and Correctional Medical Care, Inc.  These Defendants failed to adequately examine the Plaintiff, failed to adequately investigate his injuries, failed to provide him with anything more than cursory, "once-over" medical attention until nearly three weeks after he was assaulted and injured, gave him medication he was allergic to, and failed to provide the Plaintiff with adequate treatment for his severe pain and injuries.

150. Defendants County of Albany and the Albany County Sheriff's Office, through their policies, customs, or practices, or through their express or implicit ratification of the policies, customs, or practices of their senior policy-makers and Correctional Medical Care, Inc., routinely delay and deny clearly warranted medical care for inmates in their care at the ACCF, including the Plaintiff.  These policies, customs, or practices endanger the health and well-being of inmates, including the Plaintiff.

151. According to several press reports, the Commission of Correction has issued reports faulting Defendant Correctional Medical Care in the deaths of nine inmates at facilities in New York State at which it is contracted to provide medical care.

152. Despite this, Defendant County of Albany contracts with Defendant Correctional Medical Care, Inc. to provide medical care to ACCF inmates, including the Plaintiff.

153. The actions and inactions of the above-named Defendants were objectively unreasonable,  deliberately indifferent to the Plaintiff's serious medical needs, motivated by malice and or gross negligence, and subjected the Plaintiff to unnecessary, prolonged, and severe pain, injury, eating difficulties, sleeping difficulties, headaches, breathing difficulties, dizziness, neck, back, and other problems.  The Plaintiff continues to suffer from his injuries.

154. The aforementioned actions and inactions of the above-named Defendants, taken under color of state law, violated the Plaintiff's right to be free from cruel and unusual punishment, and are also a violation of 42 U.S.C. § 1983.

155. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.


**AS AND FOR A FOURTH CAUSE OF ACTION AGAINST DEFENDANTS SERGEANT FRANCIS AND CHIEF MOONEY**

**Violation of Constitutional Rights Under Color of State Law
Retaliation for the Exercise of Constitutionally Protected Rights**

156. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 155.

157. Correctional officials are precluded from punishing inmates for exercising their right to redress violations of their Constitutional rights.

158. The above-named Defendants deliberately retaliated against the Plaintiff for submitting grievances about his treatment and confinement in solitary, going so far as to tell him that his prolonged solitary confinement was a result of his grievances and of his refusal to withdraw them.

159. The Defendants' actions were undertaken with malice to punish the Plaintiff because he spoke out about the unconstitutional actions of corrections officers and deputies.

160. The aforementioned acts of retaliation by the above-named Defendants, taken under color of state law, violated the Plaintiff's right to grieve, without punishment, against the unconstitutional acts taken against him, and are also a violation of 42 U.S.C. § 1983.

161. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

**AS AND FOR A FIFTH CAUSE OF ACTION AGAINST DEFENDANTS SHERIFF APPLE, FORMER SUPERINTENDENT WIGGER, ALBANY COUNTY SHERIFF'S OFFICE, AND ALBANY COUNTY**

**Violation of Constitutional Rights Under Color of State Law**
**Implementation of Policies that Directly Violate Constitutional Rights/Failure to Implement Policies and Practices to Avoid Violations of Constitutional Rights and Failure to Train/Supervise Employees and Agents**

162. Plaintiff incorporates by reference and realleges each and every allegation as stated in paragraphs 1 to 161.

163. Defendant Sheriff Apple, as a senior policy-maker for the Albany County Sheriff's Office, is responsible for the approval, establishment, and enforcement of the policies, customs, and practices of the County of Albany as they apply to the ACCF, and for the hiring, training, and supervision of his subordinates at the Albany County Sheriff's Office and the ACCF.

164. Defendant Former Superintendent Wigger was, during his tenure, directly responsible for the day-to-day operations of the ACCF and of the day-to-day supervision of staff at the ACCF.

165. Defendants County of Albany and the Albany County Sheriff's Office are accountable for the policies, procedures, and practices, actions, hiring, and supervisory decisions of their policy makers.

166. Upon information and belief, Defendants Sheriff Apple and Former Superintendent Wigger, and the County of Albany and the Albany County Sheriff's Office through Sheriff Apple and Former Superintendent Wigger, have failed to institute and implement appropriate policies at the Albany County Sheriff's Office and the ACCF on a variety of subjects including the use of force, the duty to protect, the duty to intervene, retaliation, the right to adequate medical care, and other areas of importance to the Constitutional rights of ACCF inmates.

167. In the alternative, and upon information and belief, these Defendants have instituted policies addressing these topics but have, through gross negligence demonstrated deliberate indifference to inmates at the ACCF by failing or refusing to enforce these policies.

168. The above-named Defendants have also, upon information and belief, failed to adequately hire, screen, or supervise corrections officers, deputies, and medical staff, or to provide adequate training regarding their duties as they relate to the Constitutional rights of inmates in their care.

169. Upon information and belief, the above-named Defendants, in accordance with their policies, customs, or practices, and/or through their failures to act on information indicating violations were occurring, and/or through their gross negligence in supervising their subordinates, caused and allowed the rights of the Plaintiff to be violated over the course of several months.

170. As heretofore alleged, the above-named Defendants were made aware of at least one of the assaults against the Plaintiff (the bullpen assault) through incident reports and jail video of the assault, and the Defendant Sheriff's Office did or should have investigated the incident.

171. Despite learning of the violations against the Plaintiff, however, upon information and belief, the above-named Defendants failed to take any actions to remedy these violations or to prevent further violations against the Plaintiff.

172. The above-named Defendants also, upon information and belief, failed to discipline, failed to more closely supervise, and failed to require additional training of any of the at least eighteen of their subordinates who were involved in the assaults, cover-up, or retaliation against the Plaintiff.

173. Instead, the above-named Defendants ratified and implicitly authorized these violations by turning a blind-eye to them and allowing the Plaintiff's rights to continue to be violated.

174. The actions and inactions of the above-named Defendants, taken under color of state law, violated the Plaintiff's right to be free from cruel and unusual punishment as guaranteed to him under the Eighth and Fourteenth Amendments of the Constitution of the United States, and are also a violation of 42 U.S.C. § 1983.

175. As a direct and proximate result of the unconstitutional acts described above, the Plaintiff has been irreparably injured.

## DEMAND FOR PUNITIVE DAMAGES

176. The actions and inactions of the individual Defendants as described were extreme,

outrageous, and shock the conscience of a reasonable person and an award of punitive

damages is appropriate.  Punitive damages are not sought from the municipal Defendants.

## DEMAND FOR TRIAL BY JURY

177. The Plaintiff hereby demands a trial by jury.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiff Winston E. Hyman requests that this Honorable Court grant

him the following relief:

A.  A judgment in favor of the Plaintiff against all Defendants for compensatory damages

in an amount to be determined by a properly charged jury;

B.  A judgment in favor of the Plaintiff against all individual Defendants for punitive

damages in an amount to be determined by a properly charged jury;

C.  A monetary award for attorney's fees and the costs of this action pursuant to 42 USC

§ 1988;

D.  Any other relief this Court finds to be just, proper, and equitable.

Dated: May 2, 2014

       Albany, New York

Respectfully submitted,


s/ **Jessica M. Gorman**

Jessica M. Gorman

USDC NDNY Bar Roll No.: 516068

Law Office of Jessica M. Gorman

90 State Street, Suite 700

Albany, New York 12207

T: 518-795-5022

F: 518-514-1180

Electronic mail:

jmgorman@jmgormanlaw.com


**ATTORNEY FOR THE PLAINTIFF**

**WINSTON E. HYMAN**