UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

**WINSTON E. HYMAN,**

**Plaintiff,**

-v-

9:13-CV-770 (NAM/ATB)

**COUNTY OF ALBANY, CRAIG APPLE, THOMAS WIGGER, CHIEF BRIAN MOONEY, DEPUTY CHRISTOPHER B. ABRAMS, DEPUTY JARROD M. JOURDIN, DEPUTY LANNY JENSEN, DEPUTY JOSHUA W. COLLINS, SERGEANT TIMOTHY FRANCIS, OFFICER JULIE HALL, NURSE CHRISTINE MORIARTY, NURSE PATRICIA FRASER, S. AZAZ HAIDER-SHAH, CORRECTIONAL MEDICAL CARE, INC., OFFICER MATTHEW COREY, OFFICER TIMOTHY KEHN, OFFICER DENNIS GALKIEWISZ, OFFICER JAMES SHEEDY, SERGEANT JOHN CRUDO, LIEUTENANT WILLIAM FITCH, NURSE RICHARD KOWALSKI, NURSE MARA RIVERA, NURSE LORI HORN, AND NURSE CARLY LAGACE,**

**Defendants.**

◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇◇

APPEARANCES:

Office of Jessica M. Gorman
Jessica M. Gorman, Esq., of counsel
74 Chapel Street, 2nd Floor
Albany, New York 12207
Attorney for Plaintiff

Albany County Attorney's Office
Thomas Marcelle, Esq., of counsel
Patrick J. Collins, Esq., of counsel
112 State Street, 10th Floor
Albany, New York 12207
Attorney for Defendants County of Albany, Craig Apple, Thomas Wigger, Chief Brian Mooney, Deputy
Christopher B. Abrams, Deputy Jarrod M. Jourdin, Deputy Lanny Jensen, Deputy Joshua W. Collins,
Sergeant Timothy Francis, Officer Julie Hall, Officer Matthew Corey, Officer Timothy Kehn, Officer
Dennis Galkiewisz, Officer James Sheedy, Sergeant John Crudo, Lieutenant William Fitch

Smith, Sovik, Kendrick & Sugnet, PC
Daniel R. Ryan, Esq., of counsel
250 South Clinton Street

Suite 600
Syracuse, New York 13202
Attorney for Defendants Nurse Christine Moriarity, Nurse Patricia Fraser, S. Azaz Haider-Shah,
Correctional Medical Care, Inc., Nurse Richard Kowalski, Nurse Lori Horn, and Nurse Carly Lagace

**Hon. Norman A. Mordue, Senior U.S. District Judge:**

## MEMORANDUM-DECISION AND ORDER

## INTRODUCTION

In his amended complaint (Dkt. No. 64), plaintiff, who has been represented by counsel throughout this action, claims that on August 16, 2012, while he was incarcerated as a pre-trial detainee at the Albany County Correctional Facility ("ACCF") in Albany, New York, defendants deprived him of his rights under the United States Constitution when they assaulted him, failed to provide appropriate medical care, and retaliated against him for filing grievances related to his treatment.  Plaintiff  asserts causes of action under 42 U.S.C. § 1983 for excessive force, failure to intervene, deliberate indifference to medical needs, and retaliation, as well as supervisory liability and *Monell* liability.

Defendants Christine Moriarity, L.P.N. (incorrectly spelled in caption as "Moriarty") ("Nurse Moriarity"), Patricia Fraser, R.N. ("Nurse Fraser"), Syed Azaz Haider-Shah, M.D. ("Dr. Haider-Shah"), Correctional Medical Care, Inc. ("Correctional Medical Care"), Nurse Richard Kowalski, Nurse Lori Horn, and Nurse Carly Lagace (collectively, "Medical Defendants") move (Dkt. No. 105) for summary judgment dismissing the claims against them.[1]  Defendants County of Albany, Albany County Sheriff Craig D. Apple ("Sheriff Apple"), and former Superintendent of ACCF Thomas Wigger ("Superintendent Wigger") move (Dkt. No. 107) for summary judgment dismissing the third cause of action as against the County of Albany and the fifth cause of action

---

[1]  Named defendant Nurse Mara Rivera was not served with process.

as against the County of Albany, Sheriff Apple, and Superintendent Wigger.

As set forth below, the Court grants in its entirety the summary judgment motion (Dkt. No. 105) by the Medical Defendants for dismissal of the third cause of action, and dismisses all claims against them with prejudice. The Court also grants in its entirety the summary judgment motion (Dkt. No. 107), dismisses with prejudice the third cause of action as against the County of Albany, and dismisses with prejudice the fifth cause of action against County of Albany, Sheriff Apple, and Superintendent Wigger.

## SECTION 1983; STANDARD ON SUMMARY JUDGMENT

Title 42 U.S.C. § 1983 ("section 1983") provides a cause of action against "[e]very person who, under color of any statute ... of any State ... subjects, or causes to be subjected, any citizen ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws[.]" The Supreme Court explains that "[t]he purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992). Section 1983 does not itself create enforceable rights; rather, it provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 394 (citation omitted).

The party moving for summary judgment must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the movant has met this burden, the burden shifts to the non-movant to adduce evidence establishing the existence of an issue of material fact. *See Linares v. McLaughlin*, 423 Fed.Appx. 84, 86 (2d Cir. 2011). If the non-movant fails to make such a showing, the movant is entitled to summary judgment. When

deciding a summary judgment motion, the court must view the record evidence in the light most favorable to the the non-movant and draw all reasonable inferences in his favor. *See Ramos v. Baldor Specialty Foods, Inc*., 687 F.3d 554, 558 (2d Cir. 2012). Summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party[.]" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986).

## AMENDED COMPLAINT

The Court briefly summarizes the allegations in the amended complaint (Dkt. No. 64) that are pertinent to these motions. Plaintiff, born May 17, 1964, alleges that on August 16, 2012, he was incarcerated as a pre-trial detainee at the Albany County Correctional Facility ("ACCF") in Albany, New York; that he was handcuffed and awaiting transport to a court appearance scheduled for that day; that defendant Deputy Sheriff Christopher B. Abrams ("Deputy Abrams") shoved plaintiff and then punched him in his right eye; that Deputies Abrams, Jarrod Jourdin, Lanny Jensen, and Joshua Collins, and Corrections Officers Matthew Corey and Timothy Kehn, then "rushed and tackled the Plaintiff, and threw him down, causing his head to slam on the concrete floor"; that they then choked and beat plaintiff, who lost consciousness; and that Corrections Officers Julie Hall, James Sheedy, Sergeant John Crudo, and Lieutenant William Fitch observed the assault but did not intervene.

Plaintiff further alleges that after he regained consciousness, he "repeatedly slumped down, as he was dizzy and unable to remain fully upright." He alleges: "Officers had to continuously prop the Plaintiff back up so that he could be seen by the nurse and have photographs taken." He told medical staff that he had lost consciousness. Nurse Moriarity

performed only a "cursory 'once-over' examination" of plaintiff. Plaintiff was then transported to Albany County Court for his court appearance. Upon arrival at the courthouse, one of the transport deputies "heaved" plaintiff out of the transport van, causing plaintiff, who was handcuffed and shackled, "to fall head first and hit his head on the concrete several feet below, further injuring him." The court appearance was adjourned, and upon his return to ACCF, plaintiff was placed in the Special Housing Unit ("SHU").

The amended complaint alleges that Nurse Fraser assessed plaintiff on August 16, 2012 after he was placed in SHU, and again on August 18, 2012 in response to a "sick slip" he submitted on August 17, 2012, and that she did nothing for him. Thereafter, plaintiff wrote multiple sick slips and made repeated verbal requests to be seen by the physician. The only medical treatment he received during this time was Motrin, even though his medical record noted that he was allergic to it. Plaintiff was not seen by a physician until September 4, 2014, when Dr. Haider-Shah examined him, prescribed medications, and ordered x-rays.

Plaintiff was sentenced on his underlying conviction on December 19, 2012, and transferred to Downstate Correctional Facility ("Downstate") on December 28, 2012. The amended complaint states: "To date, the Plaintiff continues to suffer from his injuries, has ongoing pain, and continues to receive medical treatment for these injuries."

The amended complaint sets forth the following causes of action under 42 U.S.C. § 1983:

- First cause of action: excessive force against Deputies Abrams, Jourdin, Jensen, and Collins, and Officers Corey, Kehn, and Galkiewicz;
- Second cause of action: failure to intervene and protect against Officers Hall, Sheedy, and Sergeant Crudo, Lieutenant Fitch, Sergeant Francis, and Chief Mooney;
- Third cause of action: deliberate indifference to serious medical needs against Nurse Christine Moriarity, Nurse Patricia Fraser, S. Azaz

-5-

Haider-Shah, Correctional Medical Care, Inc., Nurse Richard Kowalski ("Medical Defendants"), Albany County Sheriff's Office, and Albany County;

- Fourth cause of action: retaliation against Sergeant Francis and Chief Mooney;
- Fifth cause of action: supervisory and *Monell* liability against Sheriff Apple, former Superintendent Wigger, and Albany County.

Plaintiff seeks compensatory and punitive damages and attorney's fees.

The Medical Defendants move (Dkt. No. 105) for summary judgment dismissing the claims against them. Defendants Sheriff Apple, County of Albany, and Superintendent Wigger move (Dkt. No. 107) for summary judgment dismissing the third cause of action as against the County of Albany and the fifth cause of action as against the County of Albany, Sheriff Apple, and Superintendent Wigger. As set forth below, the motions are granted.

## DELIBERATE INDIFFERENCE TO A SERIOUS MEDICAL CONDITION

### Facts

The facts set forth below are undisputed and fully supported by the record, unless otherwise indicated.[2] Correctional Medical Care provides medical services to ACCF pursuant to a contract with the County of Albany. The individual Medical Defendants were employees of Correctional Medical Care. Dr. Haider-Shah, as Medical Director at ACCF during the times in issue, was responsible for the clinical elements of the medical department at ACCF, oversaw the medical services provided to inmates at ACCF, supervised the clinical services provided by medical staff, and reviewed and approved treatment protocols. As such, he is familiar with the

---

[2] The amended complaint is unverified. Many of the factual matters asserted in the amended complaint are identical to those set forth in the properly verified initial complaint. Plaintiff is entitled to rely on those facts in opposing summary judgment. *See Fitzgerald v. Henderson*, 251 F.3d 345, 361 (2d Cir. 2001) ("This verification was the equivalent of the oath that would be given with respect to an affidavit. Thus, to the extent the amended complaint asserted factual matters other than on information and belief, [plaintiff] was entitled to rely on it in opposing summary judgment.").

medical care and treatment rendered to plaintiff during his incarceration at ACCF.

Plaintiff was arrested on March 25, 2012. On March 26, 2012, he was incarcerated at ACCF. The intake assessment completed by ACCF medical staff upon his incarceration states that plaintiff reported that he had been treated on March 25, 2012 at Albany Medical Center for rib fractures apparently sustained during his arrest. The intake assessment stated that plaintiff reported an allergy to aspirin.

On March 27, 2012, Dr. Haider-Shah examined plaintiff. According to Dr. Haider-Shah, plaintiff complained of neck, shoulder, and knee pain, and stated that, sometime before his incarceration at ACCF, he had been taking 800 mg of Motrin three times per day on an empty stomach, which caused "burning" in his stomach. Plaintiff testified in his deposition that at some earlier time he had been taking 500 mg of Motrin three times a day, and that it caused him to "throw up." Plaintiff also believed he was allergic to aspirin because, since childhood, his mother had told him so. No medical professional has diagnosed plaintiff with an allergy to aspirin or Motrin. On March 27, 2012, Dr. Haider-Shah prescribed Tylenol to manage plaintiff's pain.

ACCF medical records show that on May 23, 2012, plaintiff submitted a health services request form (referred to as a "sick slip") with complaints of pain in his knee, back, and feet. Medical staff examined plaintiff. He told them the Tylenol was not working to relieve his pain.

On August 16, 2012, plaintiff was involved in the bullpen incident underlying this lawsuit. Immediately following the incident, ACCF medical staff members Christine Moriarity, L.P.N. and Patricia Fraser, R.N. assessed plaintiff in the booking area. The evidence is that Nurse Fraser as an R.N. had the authority to assess an inmate, examine him, and refer him to a physician, and that Nurse Moriarity as an L.P.N. was not authorized to assess an inmate, examine him, or call a

physician, although she said that in some circumstances, she might go directly to the physician if one was on site. Nurse Moriarity was authorized to administer medications and take vital signs.

Nurse Moriarity testified:

> Q. ... If a patient communicates a medical concern to you what are you supposed to do with that concern?
> A. Notify the charge nurse.
> Q. Are you supposed to document it?
> A. No. I notify the charge nurse, have the patient seen by the RN, RN assesses the patient, if there is a problem with that, if she cannot rectify, then she will go to the physician.
> ***
> Q. ... So medical emergencies you report to the charge nurse?
> A. Yes.
> Q. If it's not a medical emergency do you then tell the patient to fill out a sick call slip?
> A. Absolutely.
> Q. Okay. Have there been occasions in your experience here where there's not been a medical emergency but you have nonetheless reported a patient's concerns verbally to the charge nurse?
> A. Yes.
> Q. Okay. And on those occasions why did you decide to verbally report versus telling the patient to fill out a sick slip?
> A. Because there's 800 people in the jail and you have to determine who needs emergent medical care. You can't relate everything to the charge nurse that everybody says. That 's why the process and the policy for the sick call is in place. So if I see somebody bleeding or somebody with an infection, of course it's going to get taken care of right now. My role out there is to deliver medication. The policy is in effect for the sick call slips, and they know that.

In her deposition, Nurse Fraser was questioned closely regarding her initial assessment of plaintiff immediately after the bullpen incident on August 16, 2012. She stated that she observed blood on the side of plaintiff's face and nose, and some swelling and redness, but no open wounds. Asked whether she recalled plaintiff telling her that he had lost consciousness, she replied: "No, I don't remember him telling me that. When I went over there he was alert and oriented. He was sitting up." Her notes from that assessment stated:

-8-

> Blood noted on the left side of his face and mouth and right side of nose. Right eye swollen and reddened. Clean with normal saline. No open wounds noted. Patient states unable to move neck, but patient was moving head around while pictures were taken. No other complaints at this time.

Nurse Fraser testified that whenever she treated an inmate who had an open wound or swelling on the head or face, she would refer him to a physician. When questioned about the symptoms of a concussion, she enumerated severe headache, dizziness, and visual problems. Specifically regarding plaintiff, she stated that in retrospect, based on her notes, she "probably should have" referred plaintiff to a physician because of his eye. She continued: "You know, at the time when I wrote it, I wrote it because he was okay. When I saw him, he was okay." There is no evidence that the swollen eye resulted in permanent or long-term health problems or caused plaintiff more than a few days' discomfort. In an affidavit in support of this motion, Dr. Haider-Shah stated it was his opinion, within a reasonable degree of medical certainty, that the care provided to plaintiff immediately following the altercation on August 16, 2012, was entirely appropriate and within

the standard of care. There is no medical evidence to the contrary.

Plaintiff testified at his deposition that he lost consciousness during the August 16, 2012 bullpen incident; that when he regained consciousness he was in a different bullpen and two corrections officers were telling him to sit up; that the nurse arrived; that the officers and the nurse kept telling him to sit up so the nurse could take his blood pressure; and that the nurse cleaned up his lip because it was bleeding. At his deposition, he was not asked and did not state whether he told the nurse he had lost consciousness. He did make this allegation in his verified complaint and his amended complaint.

Plaintiff further testified that he was then processed for transport to Albany County Court

for his court appearance and that while he was handcuffed and shackled one of the deputies caused him to fall from the transport van to the concrete several feet below. He stated: "I fell right out of the van. [A deputy] snatched me out of the van ... but my feet didn't hit first. My body - - my shoulder and my head went down on the ground." He stated that his left shoulder hit first, then the top part of his head; that he did not lose consciousness; that there was no blood on the ground; and that there was no gash on his head, but just "a knot." He said he "hurt all over."

Upon his return from court on the same day, he was put in the SHU. Questioned about his condition when he was placed in the SHU, he testified:

> A. My body was aching, my upper and lower body. My head - - I was getting headaches. My eyes was swelling.... They wasn't fully swollen, but like they was swelling up. My mouth   my mouth was very sore, because I had cuts in my mouth. That was pretty much - -
> Q. Anything else?
> A. I couldn't sleep. I wanted to sleep, but I couldn't sleep.
> Q. Why couldn't you sleep?
> A. It was like - - because my body, I would wake up. All I wanted to do was sleep, but I couldn't,
> because my body would just cramp.
> Q. Was it body aches that kept you from sleeping, or was it something else?
> A. My head was throbbing like -- throbbing like - - it was a body ache and my face ached. Everything.

Nurse Fraser came to assess plaintiff immediately after he was placed in SHU. She wrote: "Patient has swelling right eye and right side face. Complain of chest discomfort when breathing. No other complaints." That evening one of the nursing staff came to his cell and gave him medication.

According to plaintiff, the next day, Friday August 17, 2012, he was seen twice in SHU and given medication – once by Nurse Fraser and once by Nurse Moriarity. He stated he told Nurse Moriarity he had a severe headache. Regarding his conversation with Nurse Fraser, he

-10-

testified: "I told her my body was aching, I can't even move. I really can't even get up, because she was telling me to get up to get my medication at the gate, which the CO had to open it up and let her bring it to me." On August 17, 2012, plaintiff submitted a sick slip. It states: "My body is hurting very bad. My head is hurting the most. I was unable to sleep at all. I really need to be check[ed] out by a doctor."

In response to plaintiff's August 17, 2012, sick slip, Nurse Fraser saw plaintiff at sick call on August 18, 2012. She testified:

> A. ... He wrote in a sick call that he was having headaches and in the middle of his chest was hurting. And I don't remember what else, but he was complaining of pain in the middle of his chest. I did my vital signs on him, talked to him, observing him. His breathing was fine. He was talking fine. So I called the physician and let him know what was going on with him.
> Q. Do you remember your communications with the physician?
> A. Yes. I spoke with the physician and he gave me an order for Motrin at a very low dose, Motrin 200, three times a day because of the pain. I was concerned about the pain management of him.

She assessed his chest pain by pressing on his chest and concluded that it was probably just muscle pain, not a heart attack. She not refer plaintiff to be seen by a physician.

Dr. Haider-Shah testified about this August 18, 2012 conversation with Nurse Fraser. She reported to him that plaintiff complained of head pain and chest pain. Asked whether he had concerns about the cause of the head pain, he replied, "No ... he had neck pain back in the beginning of the year when I saw him first time." With respect to the chest pain that plaintiff reported when Nurse Fraser saw him on August 18, 2012, he testified:

> Q. ... So did Nurse Frazier tell you or communicate to you how - - how she came to determine that Mr. Hyman's chest pain was muscle rather than cardiac or lung?
> A. I think she wrote - - she wrote - - spoke with M.D.
> Q. Okay. So then you made the determination that it was muscle pain and not heart or lung?

-11-

A.  I agreed with her that it's muscle pain, not the heart or lung.

Questioned generally about the assessment of a patient who receives a blow to the head, Dr. Haider-Shah said that loss of consciousness was not necessarily enough to require that a patient be evaluated by a physician – as opposed to an R.N. – for a head injury.  He also pointed out that hindsight shows that plaintiff did not need to be evaluated for a head injury during the time in question.  He stated that he should have seen plaintiff sooner, but solely because "nobody ... wants to have pain for that many days."

Plaintiff continued to complain of pain, particularly in his head and body.  He submitted two more sick slips to the same effect, on August 29 and September 3, 2012.   The second sick slip in the record, dated August 29, 2012, states: "I have not been feeling to good.  My head hurt also my body still hurt."  The third sick slip, dated September 3, 2012, states: "I am still having a lot of headaches.  Also I still have been having a lot of pain coming from my upper and lower body.  I really need to see a Dr. for a follow-up from my injuries."  On the following day, he was seen by Dr. Haider-Shah.

Both Dr. Haider-Shah and Nurse Fraser testified that plaintiff was checked by medical staff every day during this period.  Regarding inmates in SHU generally, Nurse Fraser testified that a nurse makes rounds every day and sees every inmate in SHU.  Specifically, the nurse goes to each SHU inmate's window, asks him how he is doing and whether he has any questions or problems.  She stated: "If they have a problem, we would address the problem by saying to the inmate, depending on what the situation is, to put a sick call in, which he would be seen the next day.  Or usually what I would do is, if it's a serious problem, have the CO bring them down....  And come have them see the doctor."  In addition, a nurse, usually an L.P.N., goes to the inmate's

cell every day to administer his prescribed medication.

The SHU medical rounds log shows that between August 18, 2012, when Nurse Fraser saw him at sick call, and September 4, 2012, when Dr. Haider-Shah saw him, medical staff saw him in SHU on August 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and September 1, 2, 3, and 4, 2012. Nurse Fraser admitted that she sometimes forgot to initial the SHU medical rounds log. The Medication Administration Record shows that he was given medications every day during this period. No medications – not even over-the-counter drugs – are given to inmates without a physician's orders.

Regarding the administration of Motrin, which plaintiff apparently received for pain from August 18, 2012 until August 27, 2012, Nurse Fraser acknowledged that some of plaintiff's medical records indicated that plaintiff was allergic to Motrin. Plaintiff testified that, beginning on the fourth or fifth day in the SHU, he "started throwing up" from the Motrin. He said that he did not put in a sick slip about an upset stomach because he "had bigger problems than that." He acknowledged that the Motrin relieved some of his pain. He stated that he repeatedly complained to the nursing staff that he had headaches, his mouth was sore, his eyes were swollen, and he could not sleep, and that he repeatedly asked to see a doctor. As noted, the record shows that after August 17, 2012, he did not submit another sick slip until August 29, 2012.

Both Dr. Haider-Shah and Nurse Fraser stated their opinion that the benefits of the low dosage of Motrin far outweighed any potential side effects. Dr. Haider-Shah knew that plaintiff had claimed a Motrin allergy and had discussed it with plaintiff upon his admission to ACCF in March 2012. Dr. Haider-Shah testified that he did not think plaintiff had a Motrin allergy; that he would not have prescribed it if he thought he was allergic; that when he saw plaintiff upon his

admission to ACCF, plaintiff was seeking hydrocodone; and that he believed plaintiff was "faking the allergy in order to seek narcotics." Dr. Haider-Shah stated that after discussing the matter with Nurse Fraser on August 18, 2012, he "made a medical determination based on years of experience that the benefits of the low dosage of Motrin far outweighed any potential side effects of an upset stomach." It appears that plaintiff was also receiving Tylenol and Mobic, a pain medication, every day in August and early September.

Dr. Haider-Shah was questioned regarding whether there were cost considerations in determining what medications an inmate received. Dr. Haider-Shah stated: "It goes by the formulary. If there's nothing on the formulary that can relieve the problem, then cost does not matter, but if there is something alternative on the formulary, yes, the cost matters a lot." To prescribe someting "off of formulary" he had to receive approval from Correctional Medical Care; he said he made such requests "many, many times" and the approval rate was 100%. There is no evidence to suggest that the treatment Dr. Haider-Shah prescribed was less expensive than any alternative treatment or that he was otherwise motivated by cost considerations in treating plaintiff.

When he saw plaintiff on September 4, 2012, Dr. Haider-Shah noted that plaintiff complained of headaches. Dr. Haider-Shah's notes state:

> Right temporal and occipital [headaches], complaints of neck pain also. C-spine range of motion is decreased on left. C-6 and C-7 radiculopathy. Blood pressure is 156 over 92. Pulse is 80 per minute. Neuro exam is okay with normal. Heart is sinus - normal sinus rhythm. And he had systolic murmur at the apex. Assessment is headaches, C-spine - cervical spine sprain, right hip arthritis. Plan is change analgesics, add muscle relaxant. Increase blood pressure medications.

In his affidavit on this motion, Dr. Haider-Shah wrote:

I diagnosed Plaintiff with headaches, cervical spine strain, and right hip arthritis. I ordered a change in analgesics, added a muscle relaxant, increased blood pressure medications, and ordered x-rays of the right hip and cervical spine. Plaintiff's chart indicates that the x-rays of Plaintiff s right hip and cervical spine were performed and revealed no fractures and/or abnormalities. According to Plaintiff, the intensity of his headaches had decreased since the altercation on August 16, 2012.

During the remainder of his time at ACCF, plaintiff did not submit a sick slip requesting any additional medical treatment related to the injuries he allegedly sustained on August 16, 2012. He was transferred from ACCF on December 28, 2012.

In his affidavit submitted in support of the Medical Defendants' motion, Dr. Haider-Shah wrote, with detailed support drawn from the record: "Based on my review of Plaintiff s medical records from ACCF and my treatment of Plaintiff, it is my opinion, within a reasonable degree of medical certainty, that Plaintiff did not suffer from a serious medical condition during his incarceration at ACCF, specifically after the August 16, 2012 incarceration." The affidavit further stated:

It is my opinion within a reasonable degree of medical certainty that Plaintiff received medical treatment that met the standard of care and was, at the very least, adequate during his incarceration at ACCF, notably after the August 16, 2012 altercation. According to Plaintiff's chart, he was examined immediately after the altercation, was cleaned up, and cleared to go to his court appearance. Upon his return to ACCF, Plaintiff was again assessed by Nurse Fraser who noted that he had facial swelling and complaints of chest discomfort. Plaintiff was seen by medical staff every day while in SHU and made no emergent complaints to medical staff. Plaintiff was examined by Nurse Fraser on August 18, 2012, in response to a sick call request form submitted by Plaintiff. After Nurse Fraser's examination, she discussed Plaintiff's condition with me, and I prescribed 200 mg of Motrin to be taken three times per day for five days to address Plaintiff's complaints of pain. I made a medical determination based on years of experience that the benefits of the low dosage of Motrin far outweighed any potential side effects of an upset stomach. Plaintiff was administered the Motrin from August 18, 2012 through August 27, 2012, and made no complaints of side effects as a result of taking the Motrin. The fact that it appears Plaintiff was administered a low dosage of Motrin for more

-15-

than the five days I prescribed makes no difference on the benefit of prescribing Motrin to Plaintiff when compared to the potential side effect of any upset stomach. Further, I examined Plaintiff on September 4, 2012. Plaintiff's headaches had decreased in intensity since August 16, 2012 and he had complaints of neck pain. I ordered x-rays of Plaintiff's right hip and cervical spine which were unremarkable. Plaintiff's neurology examination and sinus rhythm were normal. I adjusted plaintiff's pain medication to add a muscle relaxant and increased his blood pressure medication.

It is my opinion within a reasonable degree of medical certainty, that the medical staff at ACCF took appropriate steps to examine, assess, and treat Plaintiff's complaints and the treatment rendered was appropriate and medically justifiable. Plaintiff made subjective complaints of body aches and headaches and he was treated with Motrin and other pain relievers. The medical staff did not ignore or disregard Plaintiff s complaints and rendered appropriate treatment within the standard of care. The medical staff, including myself and Nurse Fraser, made sound medical decisions and did not exhibit a deliberate indifference to Plaintiff s medical needs.

(Paragraph numbering omitted.)  Dr. Haider-Shah stated: "At no time was Plaintiff s condition serious, severe, or life threatening.  Quite frankly, Plaintiff had nothing more than some bumps and bruises as a result of the altercation on August 16, 2012."  Apart from the evidence from Dr. Haider-Shah, Nurse Fraser, and Nurse Moriarity, and medical documents such as the SHU medical rounds log, there is no evidence in the record from any physician or health care provider.

### Discussion

The amended complaint states that on August 16, 2012, the date of the bullpen incident, plaintiff was a pretrial detainee.  The Eighth Amendment's proscription of cruel and unusual punishment does not apply to a pretrial detainee, because he is not being punished.  *See Cuoco v. Moritsugu*, 222 F.3d 99, 106 (2d Cir. 2000).  Rather, a pretrial detainee in state custody is protected against mistreatment at the hands of prison officials under the Due Process Clause of

-16-

the Fourteenth Amendment.  *See Caiozzo v. Koreman*, 581 F.3d 63, 69 (2d Cir. 2009).[3]  "Claims for deliberate indifference to a serious medical condition ... of a person in custody should be analyzed under the same standard irrespective of whether they are brought under the Eighth or Fourteenth Amendment."  *Id*. at 72.

An Eighth [or Fourteenth] Amendment claim arising out of inadequate medical care requires a demonstration of "deliberate indifference to [a prisoner's] serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976).  The standard for deliberate indifference includes a subjective component and an objective component.  *See Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011). The *Hill* court explains:

> Subjectively, the official charged with deliberate indifference must act with a "sufficiently culpable state of mind." *See Wilson v. Seiter*, 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). That is, the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994).  The objective component requires that "the alleged deprivation must be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir.1996) (internal quotation marks omitted).

*Id*.  The *Hill* court continued:

> Medical malpractice does not rise to the level of a constitutional violation unless the malpractice involves culpable recklessness—"an act or a failure to act by [a] prison doctor that evinces a conscious disregard of a substantial risk of serious harm." *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998) (internal quotation marks omitted). In this connection, the Supreme Court has

---

[3] It is not clear when plaintiff was convicted; the amended complaint simply states that he was sentenced on December 19, 2012, and then transferred to Downstate.  Possibly, then, his allegedly deficient medical treatment at ACCF took place both before and after his conviction.  In any event, the same standards apply.

held that "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment." *Estelle*, 429 U.S. at 106, 97 S.Ct. 285.

It has long been the rule that a prisoner does not have the right to choose his medical treatment as long as he receives adequate treatment. *See id.* at 106-07, 97 S.Ct. 285.

> It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.

*Chance*, 143 F.3d at 703. Accordingly, we have noted that the "essential test is one of medical necessity and not one simply of desirability." *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986) (internal quotation marks omitted).

*Id*. at 123.

The Court holds that no rational jury could find on this record that any Medical Defendant acted with deliberate indifference to plaintiff's medical needs. Accepting plaintiff's version of Nurse Fraser's interaction with him on August 16, 2012, there is no evidence upon which a factfinder could conclude that she consciously disregarded a substantial risk of serious harm. *See Chance*, 143 F.3d at 703. She examined plaintiff's head for wounds and swelling and concluded he had not sustained a head injury. As Dr. Haider-Shah stated, hindsight proves that she was right. There is no medical evidence that plaintiff sustained a fracture, concussion, laceration, or other injury except bruises from the altercation of August 16, 2012. Nurse Fraser saw plaintiff again later that day, and again the next day, August 17, 2012.[4] There is no evidence that she should have changed her assessment as a result of the second August 16, 2012 visit or her August

---

[4] Although the SHU log does not show that Nurse Fraser checked on plaintiff on August 17, 2012, both she and plaintiff testified that she did.

17, 2012 visit. The following day, August 18, 2012, Nurse Fraser saw plaintiff at sick call, again assessed his condition, and spoke with Dr. Haider-Shah, who agreed with her assessment and prescribed Motrin for the pain. There is no reason why Nurse Fraser should not have relied on Dr. Haider-Shah's opinion. Thereafter, Nurse Fraser or another nurse saw plaintiff every day or almost every day in SHU. After plaintiff put in a second and third sick slip, on August 29 and September 3, 2012, Dr. Haider-Shah saw him on September 4, 2012, adjusted his medications, and ordered x-rays, which showed no injury. The reasonableness of Nurse Fraser's assessments of plaintiff's condition on August 16 and 18, 2012, and of Dr. Haider-Shah's opinion when she consulted him on August 18, 2012, are confirmed by Dr. Haider-Shah's conclusions after his examination of plaintiff on September 4, 2012 and the negative results of the x-rays he ordered. After September 4, 2012, plaintiff submitted no additional sick slips regarding any alleged injuries from the August 16, 2012 altercation. There is no evidentiary support for a finding that at any point during the time period in issue Dr. Haider-Shah or Nurse Fraser were aware of facts from which the inference could be drawn that a substantial risk of serious harm existed, or that they actually drew such an inference.

Plaintiff contends he was subjected to a denial of medical care that "cause[d] or perpetuate[d] pain," citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003). Here, viewing all facts in plaintiff's favor, there is no support for a finding that the Medical Defendants caused plaintiff's pain. Nor did they perpetuate it; to the contrary, they treated it. Plaintiff's claim that he was denied appropriate pain medication and additional diagnostic techniques, leaving him to suffer needlessly, is "a classic example of a matter for medical judgment." *Estelle*, 429 U.S. at 104. "A medical decision not to order an X-ray, or like measures, does not represent cruel and

-19-

unusual punishment." *Id*. Moreover, in the complete absence of evidentiary support from a medical provider, plaintiff's claims amount to "mere disagreement over the proper treatment," which does not create a constitutional claim. *Chance*, 143 F.3d at 703. While Dr. Haider-Shah testified that he should have seen plaintiff sooner because "nobody likes to have pain for that long," there is no evidence that any such delay presented a risk of serious harm. Thus, at most this delay amounts to a matter of "desirability," not "medical necessity." *Bolden v. Cty. of Sullivan*, 523 F. App'x 832, 833 (2d Cir. 2013) (quoting *Dean*, 804 F.2d at 215).

Plaintiff's allegation that he was allergic to Motrin and that it made him vomit does not support a claim of medical indifference. He admits that he did not report the vomiting. While some of plaintiff's medical records indicated a Motrin allergy, Dr. Haider-Shah testified that he knew plaintiff claimed to have this allergy but did not think plaintiff was actually allergic. He concluded that the pain relief the Motrin could afford outweighed the risk of stomach upset. Dr. Haider-Shah did not disregard any risk that Motrin posed to plaintiff's health; to the contrary, he took the risk into account in deciding to prescribe Motrin. Likewise, Nurse Fraser stated her opinion that the benefits of the low dosage of Motrin far outweighed any potential side effects. Again, this is clearly an issue of medical judgment. *See, e.g., Hill*, 657 F.3d at 123 (dismissing complaint where plaintiff contended that the Motrin prescribed was insufficient and opined that stronger pain medication was required).

There is no evidence here to suggest that Dr. Haider-Shah or Nurse Fraser acted from any motive other than their medical judgment. There is no evidence that they consciously chose an easier treatment plan or were motivated by cost or other considerations apart from their medical judgment. The Court finds no evidence in the record that would support a finding that Dr.

-20-

Haider-Shah or Nurse Fraser acted with a "sufficiently culpable state of mind." *Id*. at 122.

Taking the record as a whole, viewing all of the facts favorably to plaintiff, and drawing all inferences in his favor, there are no questions of fact that would warrant a trial against Dr. Haider-Shah or Nurse Fraser on the question of medical indifference. In reaching this conclusion the Court accepts as true plaintiff's allegations, including his claim that he told Nurse Fraser that he lost consciousness during the altercation; that he repeatedly complained to medical staff of body pain and head pain; that on a couple of days between August 16, 2012 and the day Dr. Haider-Shah saw him on September 4, 2012, no one checked him in SHU or provided his medications; and that the Motrin made him vomit. As stated, on this record, at most, plaintiff complains of Dr. Haider-Shah's and Nurse Fraser's exercise of medical judgment. For essentially the same reasons, there is no basis for a deliberate indifference claim against Nurse Moriarity; in any event, as an L.P.N. she did not have the training or the authority to assess plaintiff's condition or to determine whether he should be seen by a physician or should be prescribed medications. Further, there is no record evidence supporting liability on the part of Nurse Richard Kowalski, Nurse Lori Horn, or Nurse Carly Lagace. Having found no underlying constitutional violation, the Court dismisses all medical indifference claims against Correctional Medical Care and Albany County.[5] The record taken as a whole could not lead a rational trier of fact to find for plaintiff on his claims in the third cause of action of the amended complaint. Summary judgment is granted dismissing with prejudice all claims in the third cause of action against all defendants.

## SUPERVISORY AND *MONELL* LIABILITY

---

[5] The Court dismissed plaintiff's claims against Albany County Sheriff's Office in its Memorandum-Decision and Order of September 24, 2014 (Dkt. No. 96).

The fifth cause of action in the amended complaint alleges that the County of Albany, Sheriff Apple, and Superintendent Wigger violated plaintiff's rights. As stated in his Memorandum of Law, plaintiff claims that the County of Albany is liable for the misconduct of Sheriff Apple and Superintendent Wigger, who plaintiff avers are final policymakers. He claims that Sheriff Apple and Superintendent Wigger are personally liable for the constitutional violations he alleges based on the following: they learned of the violations against him and failed to remedy them; they created or allowed to continue a policy or custom under which the violations occurred; and they were grossly negligent in training or supervising their subordinates who committed the violations.

Plaintiff also alleges liability against these defendants based on policies and supervision regarding medical care. Any such claim is dismissed for the reasons set forth above in connection with the third cause of action.

### Facts

The Court sets forth facts pertinent to the issues on the summary judgment motion by the County of Albany, Sheriff Apple, and Superintendent Wigger. The facts are undisputed unless otherwise indicated, and have support in the record. The Court notes that plaintiff deposed Chief Correctional Officer Brian B. Mooney ("Chief Mooney"), Deputy Sheriff Jarrod M. Jourdin ("Deputy Jourdin")[6], and Deputy Sheriff Joshua W. Collins ("Deputy Collins"), and did not depose Sheriff Apple or Superintendent Wigger.

Plaintiff testified that between 2003 and 2012, he had been incarcerated at ACCF

---

[6] Deputy Jourdin testified that he was a deputy sheriff at all relevant times. He served as a deputy sheriff for nine years before accepting a position with the Albany Police Department.

"numerous" times, and that, except for the incident underlying this lawsuit, he never had a problem with ACCF corrections, medical, or other staff. As stated, plaintiff's 2012 incarceration at ACCF began on March 26, 2012. On the morning of August 16, 2012, a corrections officer brought plaintiff to the booking area of ACCF to prepare him for transport to court. When plaintiff arrived in booking, he changed into a jumpsuit and walked to the bullpen area. Both Sheriff Apple and Superintendent Wigger testified that they were not present in ACCF booking or the bullpen at the time and did not directly supervise any of the officers who handled plaintiff during the bullpen incident. There is no evidence to the contrary. After Deputy Abrams strip-searched plaintiff, the disputed interaction between plaintiff and Deputy Abrams occurred. Plaintiff claims that defendant Deputy Abrams initiated the interaction by shoving plaintiff and punching him in his right eye; defendants contend that plaintiff initiated the altercation when he shoved Deputy Abrams with his cuffed hands. Officers then rushed towards plaintiff, brought him to the floor, and apprehended him. After plaintiff was apprehended, medical staff was called to booking to evaluate him. Deputy sheriffs then transported plaintiff to Albany County Court, and then back to ACCF later that day. Sheriff Apple and Superintendent Wigger each declared that he did not directly supervise any of the officers responsible for transporting plaintiff to and from court; plaintiff submits no evidence to the contrary. Upon his return to ACCF, plaintiff was placed in SHU.

The Inmate Disciplinary Review Form dated August 23, 2012, shows that the hearing officer found plaintiff guilty of violating two ACCF Rules of Conduct in connection with the August 16, 2012 bullpen incident: 106.10 ("Inmates shall immediately comply with all orders of personnel without argument.") and 107.10 ("Inmates shall not physically or verbally obstruct or

interfere with an employee at any time."); and not guilty of the following: 100.10 ("Inmates shall not assault, inflict or attempt to inflict bodily harm upon any other inmate, staff member or visitor.") and 104.11 ("Inmates shall not engage in any violent conduct or conduct involving the threat of violence.").   The hearing officer issued discipline including 100 days in SHU.

On or about August 27, 2012, plaintiff sent a letter to the New York State Commission of Correction ("Commission") alleging he had been assaulted by corrections officers on August 16, 2012.  On September 5, 2012, the Commission asked Superintendent Wigger to investigate the claims in the letter.  Superintendent Wigger directed Chief Mooney to perform the requested investigation.

On September 10, 2012, Chief Mooney concluded his investigation and prepared a report determining that plaintiff's allegations were "unfounded."  He forwarded the report to the Commission, which requested no further action.  At no time did plaintiff contact Sheriff Apple or Superintendent Wigger with respect to any issues during his 2012 incarceration.  When he was deposed, plaintiff did not directly ascribe any wrongdoing to Sheriff Apple or Superintendent Wigger.  Plaintiff was sentenced on his underlying conviction on December 19, 2012 and transferred from ACCF to Downstate Correctional Facility on December 28, 2012.

Sheriff Apple stated that, throughout his tenure as Sheriff, he has instituted and maintained formal, written policies that govern the entire Sheriff's Office, including ACCF, setting forth standards for officer training, the use of reasonable force, the protection of prisoners, the provision of medical care to inmates, and appropriate employee conduct.  Movants  assert that the personnel files produced during discovery demonstrate that defendant officers received acceptable to outstanding annual employee reviews; that each defendant officer has completed

-24-

and continues to receive the requisite training for his or her position; that where a defendant officer was disciplined it was for a single, isolated incident or for an incident that was unrelated to the type of claims made by plaintiff; and that a number of the defendant officers have received letters of commendations, internally or from the public, for excellent work. Plaintiff makes no showing to the contrary.

Chief Mooney has never been disciplined since being promoted to Chief Corrections Officer in 2008. He stated under oath that his sole discipline throughout his 18-year career at ACCF was from "a long time ago" before he became chief, and concerned failure to fill out an inmate disciplinary report form. He also states that he has never been the subject of a complaint from co-workers, supervisors, or the general public. Plaintiff makes no showing to the contrary.

Deputy Jourdin was involved in the incident on the morning of August 16, 2012. Deputy Jourdin testified that during his nine-year career with the Sheriff's Office he was disciplined only once, as a result of having been in a minor car accident, and that he has never been the subject of complaints from co-workers or from the general public. Plaintiff does not show otherwise.

Deputy Collins, also an officer involved in the apprehension of plaintiff, has served with the Sheriff's Office for approximately 14 years. He testified that he has only been disciplined once, for a reason completely unrelated to the types of claims plaintiff is making in his amended complaint. Plaintiff submits no evidence to the contrary.

Deputy Collins testified that he received basic initial training in use of force, annual in-service training, and updates and changes in the law regarding use of force. Deputy Jourdin testified to the same effect. Plaintiff merely responds: "Admitted to the extent the defendants assert as much," but provides no evidence to the contrary. None of the involved officers was

disciplined or received extra training or supervision as a result of the incidents in issue.

### Discussion

To prevail on a claim against a municipality under section 1983, a plaintiff must establish that the deprivation of his rights was caused by a governmental custom, policy, or usage of the municipality. *Jones v. Town of E. Haven*, 691 F.3d 72, 80 (2d Cir. 2012) (citing *Monell v. Dep't of Social Servs.*, 436 U.S. 658, 690-91, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). As the *Jones* court explained:

> [I]solated acts of excessive force by non-policymaking municipal employees are generally not sufficient to demonstrate a municipal custom, policy, or usage that would justify municipal liability. On the other hand, such acts would justify liability of the municipality if, for example, they were done pursuant to municipal policy, or were sufficiently widespread and persistent to support a finding that they constituted a custom, policy, or usage of which supervisory authorities must have been aware, or if a municipal custom, policy, or usage would be inferred from evidence of deliberate indifference of supervisory officials to such abuses. A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ordered or ratified the employee's actions – either expressly or tacitly. Thus, a plaintiff can prevail against a municipality by showing that the policymaking official was aware of the employee's unconstitutional actions and consciously chose to ignore them. A municipal policymaking official's deliberate indifference to the unconstitutional actions, or risk of unconstitutional actions, of municipal employees can in certain circumstances satisfy the test for a municipal custom, policy, or usage that is actionable under Section 1983. ***

> To establish deliberate indifference a plaintiff must show that a policymaking official was aware of constitutional injury, or the risk of constitutional injury, but failed to take appropriate action to prevent or sanction violations of constitutional rights. Deliberate indifference is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action. We have held that demonstration of deliberate indifference requires a showing that the official made a conscious choice, and was not merely negligent.

*Id.* at 81 (citations, brackets, and internal quotes omitted).

Where a plaintiff seeks to hold a municipality liable for a single decision by a municipal policymaker, the plaintiff must show that the official had final policymaking power, and the challenged actions must be within that official's area of policymaking authority. *Roe v. City of Waterbury*, 542 F.3d 31, 37 (2d Cir. 2008). An official has final authority if his decisions, at the time they are made, may fairly be said to represent official policy. *Id.* (internal quotation marks omitted).

To establish a defendant's individual liability in a suit brought under 42 U.S.C. § 1983, "a plaintiff must show, *inter alia*, the defendant's personal involvement in the alleged constitutional deprivation." *Grullon v. City of New Haven*, 720 F.2d 133, 138 (2d Cir. 2013). Regarding the personal involvement of a supervisory defendant, the *Grullon* court explains:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Id.* at 139 (quoting *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995)).[7] "The fact that [defendant] was in a high position of authority is an insufficient basis for the imposition of personal liability." *McKinnon v. Patterson*, 568 F.2d 930, 934 (2d Cir. 1977).

Plaintiff acknowledges that neither Sheriff Apple nor Superintendent Wigger were present

---

[7] The impact of *Ashcroft v. Iqbal*, 556 U.S. 662, 556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), on the *Colon* formulation is as yet unresolved. *See Grullon*, 720 F.3d at 139 ("Although the Supreme Court's decision in *Ashcroft v. Iqbal* ... may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations, we need not reach *Iqbal's* impact on *Colon* in this case[.]"). In any event none of the *Colon* factors warrants denial of summary judgment in the instant case.

in the bullpen at the time of the alleged beating on August 16, 2012. Rather, plaintiff argues:

> ... Sheriff Apple and Superintendent Wigger are liable for the violations against the Plaintiff because they were personally involved, either directly or by delegation or approval, in three ways: 1) They learned of the violations against the Plaintiff and failed to remedy them; 2) they created or allowed to continue a policy or custom under which the violations occurred; and 3) they were grossly negligent in training or supervising their subordinates who committed the violations.

### _Failure to Remedy Violations_

Plaintiff argues that he has raised a question of fact defeating summary judgment because he has adduced evidence that Sheriff Apple and/or Superintendent Wigger, after being informed of the alleged violation through a report or appeal, failed to remedy the wrong. To impose supervisory liability on this ground, a plaintiff must show that the official had "actual or constructive notice of the unconstitutional practices and demonstrate[d] gross negligence or deliberate indifference by failing to act." _Merriwether v. Coughlin_, 879 F.2d 1037, 1048 (2d Cir. 1989) (internal quotation omitted). In _Merriwether_, supervisory liability for excessive force was based on evidence that officials should have known **prior to** the beatings that the plaintiff's reputations as activists would "expose them to extreme hostility from corrections officers" but took no precautions to ensure plaintiffs' safety. Here, there is no evidence that Sheriff Apple or Superintendent Wigger had any prior knowledge such that inaction on their part could have caused plaintiff's alleged injuries. _See Poe v. Leonard_, 282 F.3d 123, 140 (2d Cir. 2002) ("[A] supervisor may be found liable for his deliberate indifference to the rights of others by his failure to act on information indicating unconstitutional acts were occurring ... provided that the plaintiff can show an **affirmative causal link** between the supervisor's inaction and [his] injury" (emphasis added)); _Morgan v. Ward_, 2016 WL 427913, at *8 (S.D.N.Y. Feb. 2, 2016) ("If the

-28-

official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." (quoting *Harnett v. Barr*, 538 F. Supp. 2d 511, 524 (N.D.N.Y. 2008)).  Viewed as a whole and most favorably to plaintiff, the record herein would not permit a rational jury to find that plaintiff's alleged injuries were caused by any failure on the part of Sheriff Apple or Superintendent Wigger to remedy an unconstitutional act.

### *Policy or Custom; Investigation*

Evidence is likewise lacking to support plaintiff's contention that Sheriff Apple and/or Superintendent Wigger created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom.  Plaintiff's own testimony is that prior to this incident he had never had a problem with ACCF's corrections officers, guards, medical staff, or other staff during the numerous times he has been incarcerated at ACCF since 2003.  His conclusory allegations that he had heard of and witnessed assaults on other inmates by ACCF staff do not include any particulars and provide no support for a finding in his favor.  In addition, the personnel files produced in discovery provide some support for a finding that there was no unconstitutional policy in place during plaintiff's 2012 incarceration.

Plaintiff contends that Chief Mooney conducted an inadequate investigation of the August 16, 2012 incident and argues that this inadequate investigation is evidence of a custom or policy. Plaintiff's critique of the investigation is based primarily on plaintiff's disagreement with the incident reports and use of force reports and on some inconsistencies therein, leading him to conclude that the reports were falsified.  Plaintiff also argues that Chief Mooney should have interviewed him as part of the investigation.  And plaintiff points out that the hearing officer

acquitted him of assaulting an officer, although, as defendants note, the hearing officer found that plaintiff had failed to obey an order and had "physically or verbally obstruct[ed] or interfere[d] with an employee." Accepting plaintiff's version of the facts, it nevertheless cannot be said that the investigation is so deficient that Superintendent Wigger's acceptance of it supports an inference that he created or continued an unconstitutional policy. In any event, plaintiff presents no evidence of any other allegedly inadequate investigation. "The inference that a policy existed may ... be drawn from circumstantial proof, such as ... evidence that the municipality had notice of but **repeatedly** failed to make any meaningful investigation into charges that police officers had used excessive force in violation of the complainants' civil rights." *Ricciuti v. N.Y.C. Transit Auth.*, 941 F.2d 119, 123 (2d Cir. 1991) (emphasis added); *accord Batista v. Rodriguez*, 702 F.2d 393, 397 (2d Cir. 1983) ("[M]unicipal inaction such as the **persistent** failure to discipline subordinates who violate civil rights could give rise to an inference of an unlawful municipal policy[.]" (emphasis added)). While there may be circumstances in which a single inadequate investigation could support an inference of a policy or custom to condone constitutional violations, *see Hogan v. Franco*, 896 F.Supp. 1313, 1319-20 (N.D.N.Y. 1995), the evidence here would not support such an inference. As a matter of law, the record evidence, viewed as a whole and most favorably to plaintiff, would not permit a rational jury to conclude that this allegedly improper investigation was evidence of a policy or custom on the part of Sheriff Apple or Superintendent Wigger to permit unconstitutional conduct; any such inference would be based on pure speculation.

To the extent that plaintiff asserts that a Sheriff Apple and/or Superintendent Wigger ratified the alleged use of excessive force in the bullpen, thus supporting a finding of a municipal

policy or custom, *see Jones*, 691 F.3d at 81 ("A plaintiff alleging that she has been injured by the actions of a low-level municipal employee can establish municipal liability by showing that a policymaking official ... ratified the employee's actions – either expressly or tacitly."), the Court concludes on this record that, as a matter of law, the allegedly inadequate investigation of this single incident cannot support a finding of ratification so as to constitute proof of a municipal policy or custom. Despite extensive discovery, plaintiff has failed to adduce evidence that would support a finding of ratification on the ground of inadequate investigation or any other ground. District court cases *McLennon v. City of New York*, 2016 WL 1089258, at *16 (E.D.N.Y. Mar. 18, 2016) and *Collins v. City of New York*, 923 F. Supp. 2d 462, 477 (E.D.N.Y. 2013) are not to the contrary; they both concerned motions to dismiss the complaint, not summary judgment motions.

### *Gross Negligence in Training or Supervision*

Further, plaintiff claims that Sheriff Apple and Superintendent Wigger were grossly negligent in training or supervising their subordinates who committed the alleged violations. A municipality's failure to train its subordinates satisfies the policy or custom requirement "only where the need to act is so obvious, and the inadequacy of current practices so likely to result in a deprivation of federal rights, that the municipality or official can be found deliberately indifferent to the need." *Reynolds v. Giuliani*, 506 F.3d 183, 192 (2d Cir. 2007) (citing *City of Canton, Ohio v. Harris*, 489 U.S. 378, 390, 109 S. Ct. 1197, 1205, 103 L. Ed. 2d 412 (1989)). Regarding training, the uncontroverted testimony by Deputies Collins and Jourdin establishes that they received use of force training initially and then annually thereafter. Plaintiff points to no deficiencies in the training materials defendants submitted on their motion. Nor does plaintiff show any other ground for a finding of deliberate indifference to the need for proper training or

supervision. There is no direct evidentiary support for a finding that Sheriff Apple or Superintendent Wigger were grossly negligent in training or supervision, nor is there evidence from which a rational jury could draw the inference of grossly negligent training or supervision.

Plaintiff relies on the statement in *Turpin v. Mailet*, 619 F.2d 196, 202 (2d Cir. 1980) that "a single, unusually brutal or egregious beating administered by a group of municipal employees may be sufficiently out of the ordinary to warrant an inference that it was attributable to inadequate training or supervision amounting to deliberate indifference or 'gross negligence' on the part of officials in charge." Subsequent case law has narrowed this broad principle significantly. In *City of Oklahoma City v. Tuttle*, the Supreme Court reversed a jury verdict against a municipality where the trial court instructed the jury that it could "infer" from "a single, unusually excessive use of force ... that it was attributable to inadequate training or supervision amounting to 'deliberate indifference' or 'gross negligence' on the part of the officials in charge." 471 U.S. 808, 821, 105 S. Ct. 2427, 2435, 85 L. Ed. 2d 791 (1985). The *Tuttle* court observed that such an inference "improperly allows a § 1983 plaintiff to establish municipal liability without submitting proof of a single action taken by a municipal policymaker." *Id.*, *accord Sarus v. Rotundo*, 831 F.2d 397, 402–03 (2d Cir.1987) ("[I]n the absence of other evidence, mere proof of a single incident of errant behavior is an insufficient basis for finding that a municipal policy caused plaintiff's injury"); *Fiacco v. City of Rensselaer, N.Y.*, 783 F.2d 319, 328 (2d Cir. 1986) (citing *Tuttle* for the proposition that "the existence of a policy of nonsupervision amounting to deliberate indifference to constitutional rights cannot be established by inference solely from evidence of the occurrence of the incident in question."); *Molina v. City of Elmira, N.Y.*, 2015 WL 1643280, at *6 (W.D.N.Y. Apr. 13, 2015) ("As a result [of *Tuttle*], later decisions of the Second

-32-

Circuit and the district courts within its jurisdiction have limited *Turpin* to situations where there was evidence that a municipal policymaker was aware of the brutality involved with the incident in question and failed to act." (citing *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 129 (2d Cir. 2004) (if a municipal policymaker witnesses an instance of brutality and fails to intervene, this "might be sufficient to allow a factfinder to infer deliberate indifference if the use of force were so extreme as to leave no doubt that [the municipal policymaker] consciously chose not to act"), and *Crawford v. City of New London*, 2014 WL 202369, at *15 (D.Conn. Jan. 16, 2014) (granting summary judgment dismissing municipal liability claim because "no final decision-maker or policymaker had any personal involvement or even presence at the single event. Without such personal involvement by a policymaker, the evidence in the record is insufficient to support the inference of gross negligence with respect to the supervision of the ... Police Department")).  In any event, even assuming that there may be a circumstance where a single occurrence could support an inference of deliberate indifference or gross negligence in training or supervision, the circumstances in the instant case, viewed in their entirety and most favorably to plaintiff, are insufficient to support such an inference.

    *Conclusion*

        Plaintiff's Memorandum of Law advances a number of grounds for supervisory and municipal liability.  The Court has reviewed them all, has viewed the evidence most favorably to plaintiff, has drawn all inferences in plaintiff's favor, and has considered the record as a whole. The Court finds neither direct evidence nor evidence sufficient to permit an inference that Sheriff Apple or Superintendent Wigger acted or failed to act in any manner that would support a finding that either of them was personally involved in the deprivations alleged by plaintiff.  Thus, there

can be no personal liability on the part of Sheriff Apple and Superintendent Wigger. Accordingly, even accepting that they were final policymakers, there is no basis to impose liability on the County of Albany for their acts or omissions. Nor is there any direct evidence of a municipal policy or custom, or evidence that could support an inference of a policy or custom, such as widespread and persistent deprivations or deliberate indifference of supervisory officials. Viewing the whole record most favorably to plaintiff, the Court concludes that no rational jury could find liability on the part of Sheriff Apple, Superintendent Wigger, or the County of Albany.

**CONCLUSION**

It is therefore

ORDERED that the motion (Dkt. No. 105) for summary judgment by Nurse Christine Moriarity, Nurse Patricia Fraser, S. Azaz Haider-Shah, Correctional Medical Care, Inc., Nurse Richard Kowalski, Nurse Lori Horn, and Nurse Carly Lagace is granted in its entirety with prejudice; and it is further

ORDERED that the motion (Dkt. No. 107) for summary judgment by County of Albany, Craig Apple, and Thomas Wigger is granted in its entirety with prejudice; and it is further

ORDERED that the third and fifth causes of action of the amended complaint (Dkt. No. 64) are dismissed in their entirety with prejudice; and it is further

ORDERED that all claims are dismissed against the following named defendants: Nurse Christine Moriarity, Nurse Patricia Fraser, S. Azaz Haider-Shah, Correctional Medical Care, Inc., Nurse Richard Kowalski, Nurse Lori Horn, Nurse Carly Lagace, County of Albany, Craig Apple, and Thomas Wigger; and it is further

ORDERED that Nurse Mara Rivera was never served with process and is terminated as a

defendant in this action without prejudice.

IT IS SO ORDERED.

Date:   March 31, 2016
        Syracuse, New York

_Norman A. Mordue_
**Norman A. Mordue**
**Senior U.S. District Judge**